IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

KASSANDRA NIEVES, Individually                                            PLAINTIFF
and as Personal Representative
of the Estate of Juan Nieves, and
His Surviving Heirs and Dependents

v.                          No. 3:15CV00350 JLH

COOPER MARINE & TIMBERLANDS CORPORATION;
LOGISTIC SERVICES, INC.; STEEL DYNAMICS
COLUMBUS, LLC; KINDER MORGAN BULK
TERMINALS, INC.; and KINDER MORGAN
MARINE SERVICES, LLC                                                      DEFENDANTS

**OPINION AND ORDER**

Kassandra Nieves commenced this action to recover damages for the tragic death of Juan Nieves. Nieves died when the CMT 123B barge on which he was working sank. Cooper Marine & Timberlands Corporation was the owner *pro hac vice* of the barge and is also the owner of a tug that had custody of the barge for part of its voyage. Kinder Morgan Marine Services, LLC, owned a tug that also had custody of the barge for some time. Cooper Marine and Kinder Morgan Marine Services are the only vessel-owner defendants. They have moved for summary judgment. For the following reasons, Cooper Marine's motion is granted and Kinder Morgan Marine Services's motion is granted in part and denied in part.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A genuine dispute

of material fact exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.

Steel Dynamics Columbus, LLC, manufactures steel coils and contracted with Cooper Marine to transport steel coils from Columbus, Mississippi, to Blytheville, Arkansas. Document #135-6. On March 4, 2014, Angel Camp, a Steel Dynamics logistics manager, asked Cooper Marine if it had any available barges. Document #215-3, Ex. 10. Cooper Marine asked Camp how many she wanted and whether she wanted open or covered barges. *Id.* Camp responded, "Whatever you got!" *Id.* Camp later clarified that she "need[ed] three uncovered if possible." *Id.* Ex. 11. Cooper Marine sent three barges to Columbus, one of which was the CMT 123B open hopper barge. Document #216-13 at 29, 59. Cooper Marine owned the CMT 123B barge *pro hac vice* under the terms of a bareboat charter agreement with GATX Third Aircraft, LLC. Document #135-1. Steel Dynamics enlisted Logistic Services, Inc., to load the barges in Columbus. Document #135-5 at 4-5. Steel Dynamics provided Logistic Services with the wooden dunnage, described as "saddles," to secure the steel coils. *Id.* at 5. Logistic Services prepared a stowage plan and loaded the coils in the CMT 123B barge and on the saddles without incident. Document #135-11 at 8-11. Forty-six coils were loaded on the barge. Document #135-15. All of the coils were arranged along the side of the barge end-to-end—twenty-three on each side. Document #135-16. The arrangement left a large gap down the center of the barge. *Id.* The barge was later to be unloaded by Kinder Morgan Bulk Terminals, Inc. Document #135-9 at 9-10, Document #135-19 at 3.

On March 12, 2014, a Cooper Marine tug took custody of the barge and towed it to Yellow Creek, Mississippi. Document #135-13 at 1-2. A tug owned by a different company then towed the barge to Cairo, Illinois. Document #216-13 at 9. From Cairo, yet another company and a different tug towed the barge to the Kinder Morgan Hickman Terminal in Blytheville. *Id.* Cooper Marine

2

maintained the contractual obligation to Steel Dynamics to deliver the barge to Blytheville, Arkansas. Document #135-6. This voyage of over 500 river miles was without incident. Document #216-8 at 5; Document #216-9 at 53-54. Once in Blytheville, the barge was delivered into the custody of a Kinder Morgan Marine Services tug on March 30 or 31, 2014. Document #135-18; Document #216-3 at 41.

Before taking custody of the barge, Kinder Morgan Marine Services inspected the barge and determined that it was in suitable, stable, and seaworthy condition. *Id.* On the morning of April 8, a Kinder Morgan Marine Services tug shifted the barge to Kinder Morgan's coil dock to be unloaded by stevedoring employees of Kinder Morgan Bulk Terminals. Document #216-8 at 3-4. Kinder Morgan Bulk Terminals trained its longshoremen to inspect cargo and dunnage for any issues. Document #135-19 at 8-9; Document #216-3 at 40. If cargo appeared unsecured, Kinder Morgan Bulk Terminals had chocks and wedges available that would be used to secure the cargo before unloading commenced. Document #135-19 at 5-11. If a saddle or any other type of dunnage did not look right, Kinder Morgan Bulk Terminals instructed its stevedores to take pictures and add additional chocks or wedges to the cargo. Document #208-13 at 7. If, however, any stevedoring employee thought that the cargo could not be made safe to unload, that employee had "stop-work authority" and Kinder Morgan Bulk Terminals had an obligation to reject unsafe barges. Document #135-19 at 8-12.

After the CMT 123B barge was docked, a Kinder Morgan Bulk Terminals crew led by Grady Hamilton was set to unload the barge. *Id.* at 3. Hamilton operated the crane on the coil dock that lifted the steel coils out of the barge. Document #208-13 at 3. Nieves and Nicholas Perez Hernandez, longshoremen on Hamilton's crew, climbed into the barge to inspect the cargo before unloading began. *Id.* at 5. Hamilton instructed them to ensure that the coils were properly secured

3

by saddle dunnage. Document #135-19 at 8-11. Hamilton testified that neither Nieves nor Perez Hernandez reported any issues. *Id.* at 7, 11. They did not add additional chocks or wedges to the coils but proceeded with unloading them. *Id.* at 11-12. Hamilton also testified that he had a duty to reject any barge he deemed unsafe to unload. *Id.* at 8. He testified that although he did not like the way the coils were arranged along the sides of the barge with a wide gap between them, he did not see any thing that made the barge unsafe to unload. *Id.* at 7.

While the barge was being unloaded, a Kinder Morgan Marine Services tug was towing a scrap barge upriver. Document #207 at ¶ 12. Steven Ayers, the captain of the tug, testified that he was pushing a barge that was 200 feet in length and that weighed approximately 1600 tons. Document #181-5 at 5. The tug is 65 feet long and has 3 engines. *Id.* at 3-4. It was traveling at a speed of one knot against a current of approximately three knots. *Id.* at 7. Ayers estimated that the barge and tug were 150 feet east of the CMT 123B barge. *Id.* His written statement after the accident states that the barge he was pushing upriver was "abreast," or alongside of, the CMT 123B barge. *Id.* at 10. He further testified that the stern of his tug was 100 feet downriver from, or south of, the stern of the CMT 123B barge when it sank. *Id.* at 8. Ayers testified that the barge and his tug were not putting out much of a wake at the speed they were traveling. Document #158-6 at 8. Daniel Allen and Adam Parker, crewmen on Ayer's tug, testified that the wake from their vessel had not reached the CMT 123B barge before it sank. Document #158-7 at 4; Document #158-8 at 4-5.

Frederick Siebert, a Kinder Morgan Bulk Terminals operations supervisor, witnessed the CMT 123B barge sink. Document #181-6. In his written statement after the accident, he states that he saw a Kinder Morgan Marine Services tug and a scrap barge passing by at the same time the CMT 123B barge was docked and being unloaded. *Id.* He heard the CMT 123B barge and the coil dock "clank" together and noticed that the upriver end of the CMT 123B barge raised up. *Id.*

4

Shortly after, he heard Hamilton on the radio say "I need everyone down here now, we have a barge sinking." *Id.*

Cooper Marine and Kinder Morgan Marine Services are vessel owners under the Longshore and Harbor Workers' Compensation Act. 33 U.S.C. § 905(b). The Supreme Court explained the contours of the duty of care that vessel owners owe longshoremen under section 905(b) in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 166-67, 101 S. Ct. 1614, 1622, 68 L. Ed. 2d 1 (1981). The duty consists of a turnover duty, a duty to "exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel,'" and a duty to intervene. *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98, 114 S. Ct. 2057, 2063, 129 L. Ed. 2d 78 (1994) (citation omitted). Nieves alleges Cooper Marine and Kinder Morgan Marine Services breached the turnover duty only. The turnover duty "relates to the condition of the ship upon the commencement of stevedoring operations." *Id.* It has two facets: a duty to "exercis[e] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property," and a duty to warn the stevedore of latent hazards on the vessel that are or should be known to the vessel owner and that are not known by the stevedore and would not be known by a reasonably competent stevedore. *Scindia Steam*, 451 U.S. at 167, 101 S. Ct. at 1622. The Fifth Circuit has described this duty as narrow. *Kirksey v. Tonghai Mar.*, 535 F.3d 388, 391 (5th Cir. 2008).

Part of Nieves's argument is that Cooper Marine was negligent in selecting an open hopper barge to transport the steel coils. Nieves primarily argues, however, that Cooper Marine and Kinder Morgan Marine Services breached their turnover duties by failing to reject the CMT 123B barge or warn Kinder Morgan Bulk Terminals of latent hazards. Nieves offers various reasons why these

5

defendants had the duty to reject the barge or warn Kinder Morgan Bulk Terminals, but the reasons are premised on these defendants owing a duty to determine whether the steel coils were properly and adequately secured.

Nieves's argument that Cooper Marine was negligent to provide an open hopper barge falls under the first facet of the turnover duty. According to Nieves, Cooper Marine breached its duty to exercise ordinary care to have the barge and its equipment in such condition that Kinder Morgan Bulk Terminals could carry on its cargo operations with reasonable safety when it failed to reject the CMT 123B barge. Nieves emphasizes that an open hopper barge is, by design, not suitable to transport steel coils. Nieves then argues that Cooper Marine was "in charge of selecting and providing the vessel" and that "no one else was in any position to make this determination."[1] This last contention is contradicted by undisputed evidence in the record. The emails exchanged between Angel Camp of Steel Dynamics and Cooper Marine demonstrate that Cooper Marine was not "in charge of selecting" the CMT 123B barge. Camp first emailed Cooper Marine asking for "whatever you got" but later asked for "three uncovered if possible." Document #215-3 at Ex. 10-11. Moreover, this facet of the duty requires a vessel owner to exercise reasonable care in turning over a "ship and its equipment" to a stevedore. *Scindia Steam*, 451 U.S. at 167, 101 S. Ct. at 1622. Nieves offers no evidence, and does not argue, that the barge itself or its equipment were unsafe. Nieves instead argues that the open hopper design compromised the dunnage by allowing rain to enter the cargo hold, which goes to the duty to warn under the second facet of the turnover duty.

---

[1] Nieves also cites the bareboat charter agreement as evidence that it was negligent to ship steel coils in an open hopper barge. The agreement does not expressly list steel coils as a material that Cooper Marine could transport in the CMT 123B barge. Whether Cooper Marine breached its contract with GATX is irrelevant to the duties it owed to Nieves. *See Robinson v. Orient Marine Co.*, 505 F.3d 364, 366 (5th Cir. 2007) (holding that a contractual provision between owner and charterer did not expand turnover duty owed to longshoreman); *see also Sobrino-Barrera v. Anderson Shipping Co.*, 495 F. App'x 430, 435 (5th Cir. 2012).

Nieves alleges that Cooper Marine and Kinder Morgan Marine Services breached their turnover duty by failing to warn Kinder Morgan Bulk Terminals that the steel coils were loaded or secured in an unsafe manner. Cooper Marine and Kinder Morgan Marine Services were not, however, acting as stevedores in transporting the CMT 123B barge from Columbus to Blytheville. Requiring vessel owners to assess whether cargo is properly stored—hazards that could be anticipated and prevented by a competent stevedore— "would threaten to upset the balance Congress was careful to strike in enacting the 1972 amendments [to the Longshore Act]." *Howlett*, 512 U.S. at 97, 114 S. Ct. at 2063. Cooper Marine and Kinder Morgan Marine Services could rely on Kinder Morgan Bulk Terminals to avoid exposing its longshoremen to unreasonable hazards. *See Scindia Steam*, 451 U.S. at 170, 101 S. Ct. at 1623. Both the captain of the Cooper Marine tug and the captain of the Kinder Morgan Marine Services tug testified that they inspected the barge and were entrusted with its safe travel, but they also testified that they and their crew are not stevedores and did not go down into the barge to inspect the dunnage.

Nieves's argument is caught on the horns of a dilemma. If, as Nieves argues, that the "inadequate stowage conditions [of the steel coils] should have been apparent to everyone," then there was no duty to warn Kinder Morgan Bulk Terminals. An obvious hazard is not latent and so does not implicate a vessel owner's duty to warn. *Id.* at 167, 101 S. Ct. at 1622. This was the scenario the Fifth Circuit addressed in *Anderson Shipping*. There, a longshoreman argued that the vessel owner breached its duty to warn by turning over the vessel with pipes stowed against the bulkhead with inadequate dunnage. 495 F. App'x at 434. The longshoreman testified that it was his responsibility to assess the cargo and see how the cargo was stowed before unloading it. *Id.* The court held that the hazard presented by the cargo was open and obvious and affirmed summary judgment in favor of the vessel owner. *Id.*

7

If, on the other hand, the stowage of the steel coils presented a latent hazard, the vessel owners still had no duty to warn Kinder Morgan Bulk Terminals. Nieves does not allege that either Cooper Marine or Kinder Morgan Marine Services had peculiar knowledge that the coils were loaded or secured improperly.[2] Instead, Nieves argues that the arrangement of the coils and the dunnage used created a latent hazard. But any latent hazard in the proper stowage of cargo would be known by the stevedore or should be known by a reasonably competent stevedore before a vessel owner would be charged with such knowledge. *See Scindia Steam*, 451 U.S. at 170, 101 S. Ct. at 1623. Hamilton testified that Nieves was specifically trained to go into the cargo hold, to check the cargo, and to check the dunnage. Cooper Marine and Kinder Morgan Marine Services, conversely, did not send their crew into the cargo hold but only made observations from the deck. Barge carriers have no duty to discover latent hazards outside their scope of expertise.

Nieves's final argument is that custom imposed a duty on Cooper Marine and Kinder Morgan Marine Services to inspect the cargo visually and reject the barge "because the steel coils were improperly stowed and inadequately secured." Document #215 at 19. The evidence upon which Nieves relies to establish this custom consists of the testimony of various employees of Cooper Marine and Kinder Morgan Marine Services. That testimony amounts to Cooper Marine and Kinder Morgan Marine Services acknowledging that they are responsible for the safe transport of the barge while the barge is in their custody. This responsibility, though, does not include a duty to ensure that the stevedores have properly loaded the cargo. As explained above, that duty rests with stevedores.

Cooper Marine and Kinder Morgan Marine Services did not breach their turnover duty by failing to reject the barge or by failing to warn Kinder Morgan Bulk Terminals of the steel coils'

---

[2] In fact, Nieves simply adds a latent-hazard label to the same argument above: "There is a mountain of evidence that the way the CMT 123 was loaded presented a latent hazard due to cargo being woefully and inadequately stowed and secured." Document #215 at 31.

8

stowage condition. Nieves has not demonstrated that either defendant owed an additional duty beyond the limited turnover duty. Summary judgment is granted to Cooper Marine and Kinder Morgan Marine Services on Nieves's claims of vessel negligence under section 905(b).

Kinder Morgan Marine Services also owned the tug that was pushing a scrap barge upriver at the time of the accident. Nieves alleges no vessel negligence against Kinder Morgan Marine Services on that basis. Cooper Marine, Logistic Services, and Steel Dynamics, however, have asserted cross-claims for contribution against Kinder Morgan Marine Services. They allege that the Kinder Morgan Marine Services tug and scrap barge passed unreasonably close to the docked CMT 123B barge, and the wake from the tug and scrap barge contributed to the accident. Admiralty law imposes a duty on vessels to exercise reasonable care when passing other vessels, especially docked or moored vessels. *See Maxwell v. Hapag-Lloyd Aktiengesellschaft, Hamburg*, 862 F.2d 767, 769 (9th Cir. 1988); *Anthony v. Int'l Paper Co.*, 289 F.2d 574, 579 (4th Cir. 1961). As one court long ago observed, "[t]he number of cases arising from injuries caused by the swell of steamers is very great, and the reported decisions are many in number." *The Chester W. Chapin*, 155 F. 854, 856 (E.D.N.Y. 1907). That court deduced the following principle: "That the boat causing the injury must be held responsible for any failure to appreciate the reasonable effect of its own speed and motion through the water at the particular place and under the particular circumstances where the accident occurred." *Id.* at 859.

Kinder Morgan Marine Services argues that there is no evidence that the wake from the tug and scrap barge reached the CMT 123B barge before it sank. It cites the testimony of the captain of the tug and two crewmen on the tug who all agree that the wake was small and had not yet reached the CMT 123B barge when it began to sink. Siebert, however, wrote soon after the accident that at the same time the Kinder Morgan Marine Services tug and scrap barge were passing by the

9

CMT 123B barge, he saw the upriver end of the CMT 123B barge raise up and heard the barge "clank" against the coil dock. A jury could reasonably infer from Siebert's description that the wake from the passing tug and scrap barge had reached the CMT 123B barge. Whether the wake contributed to the accident is a question of causation for the jury to determine.

## CONCLUSION

For the foregoing reasons, Cooper Marine's motion for summary judgment is GRANTED, and Kinder Morgan Marine Services's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Document #135, Document #157.

IT IS SO ORDERED this 17th day of August, 2017.

*J. Leon Holmes*
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE