# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### JONESBORO DIVISION

KASSANDRA NIEVES, Individually and as                    PLAINTIFF
Personal Representative of the Estate of Juan Nieves
and his Surviving Heirs and Dependents

v.                              NO. 3:15CV00350 JLH

COOPER MARINE & TIMBERLANDS
CORPORATION, *et al.*                                    DEFENDANTS

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Following a bench trial, the Court makes the following findings of fact and conclusions of
law on the cross-claims of Cooper Marine & Timberlands Corporation against Logistic Services,
Inc., Kinder Morgan Bulk Terminals, Inc., and Kinder Morgan Marine Services, LLC, for damages
associated with the sinking of Barge CMT 123B.[1]

### I. FINDINGS OF FACT

1.      Cooper Marine was the owner pro hac vice of Barge CMT 123B on April 8, 2014, when it

        capsized and sank at the coil dock owned and operated by Kinder Morgan Bulk Terminals

        in Hickman, Arkansas.

2.      At the time of the sinking, Kinder Morgan Bulk Terminals personnel were in the process of

        unloading steel coils from the barge using a crane.

3.      Kinder Morgan Bulk Terminals is a stevedoring company that unloads cargo from barges

        and loads cargo onto barges for its customers at some of its facilities on the inland waterway

        system. At some of those facilities, Kinder Morgan Bulk Terminals unloads steel coils from

        barges and loads steel coils onto barges.

---

[1] Cooper Marine settled with Steel Dynamics Columbus, LLC, shortly before trial. Still, the
percentage of fault, if any, attributable to Steel Dynamics is an issue before the Court.

4.      Kinder Morgan Marine Services is a company that provides fleeting and towing services for barges in and around Kinder Morgan's facility in Hickman, Arkansas.

5.      Cooper Marine is a marine transportation company that owns and operates towboats and barges that it uses to transport cargo for its customers on the inland waterway system.

6.      Logistic Services is a stevedoring company that loads cargo onto barges and unloads cargo from barges for its customers at its facilities located on the inland waterway system. One of its facilities is located in Columbus, Mississippi. The cargo that Logistic Services loads onto barges at its facility in Columbus, Mississippi, includes steel coils.

7.      Steel Dynamics is a steel company that manufactures steel coils at its mill in Columbus, Mississippi. At all relevant times, Steel Dynamics Columbus was named Severstal Columbus, LLC.[2]

8.      The Steel Dynamics mill in Columbus, Mississippi, went into production in the fall of 2007. Steel Dynamics hired Logistic Services as a stevedoring company to load the steel coils in Columbus into barges. Steel Dynamics typically used Cooper Marine as a tugboat company to take the loaded barges to the destination. Steel Dynamics sometimes shipped coils by rail to Vicksburg, Mississippi, where they were loaded onto barges by a Kinder Morgan stevedoring operation.

9.      Steel Dynamics did not direct Logistic Services or Kinder Morgan how to load and stow the steel coils. Steel Dynamics left it to the stevedoring companies to follow their own procedures.

---

[2] Because the named defendant is Steel Dynamics Columbus, LLC, the name "Steel Dynamics" will be used herein rather than the name "Severstal."

10.  Steel Dynamics provided saddles made of hardwood to Logistic Services and to the Kinder Morgan facility in Vicksburg for stowing the steel coils on barges.  The wooden saddles were 30 inches long, 3 inches wide, and 3 inches tall with a concave space into which the coils, which were round, could sit.  At the bottom of the concave space, the wooden saddles were one inch thick.

11.  Between October 18, 2007, and September 13, 2016, Steel Dynamics shipped 26,787 steel coils on a total of 469 barges.  A majority of them were loaded onto barges by Logistic Services in Columbus.  Some of these coils weighed 60,000-70,000 pounds each, while others were smaller, weighing less than 25,000 pounds each.

12.  Between March 4, 2008, and September 27, 2014, Steel Dynamics shipped 3,819 of the larger steel coils on a total of 77 barges.

13.  All of the steel coils manufactured by Steel Dynamics and shipped on barges during these time frames were stowed on the wooden saddles provided by Steel Dynamics.

14.  Steel Dynamics had sold the steel coils that were on the CMT 123B when it sank to IPSCO Tubulars, Inc.  Steel Dynamics also manufactured and sold to IPSCO other steel coils.  Steel Dynamics contracted with Logistic Services for Logistic Services to load the steel coils manufactured by Steel Dynamics and sold to IPSCO onto Barge CMT 123B, Barge BIG 420, and Barge BIG 9911 at Logistic Services' facility in Columbus, Mississippi.

15.  On or about March 8, 2014, a month prior to the incident at issue, Logistic Services personnel loaded the CMT 123B, and on or about March 10, 2014, they loaded the BIG 420, with steel coils at Logistic Services' Columbus facility.  They began loading the BIG 9911 on March 10, 2014, and finished on March 14, 2014.  Logistic Services used the same type

of saddles that they had used to secure coils on hundreds of barges loaded for Steel Dynamics for approximately seven years.

16.    Steel Dynamics contracted with Cooper Marine to transport the steel coils from the Logistic Services facility in Columbus, Mississippi, to the Kinder Morgan facility in Hickman, Arkansas.  Cooper Marine arranged for two other marine transportation companies, Tennessee Valley Towing and American Commercial Lines, to transport the barges for a portion of their voyage to Hickman, Arkansas.

17.    On March 12, 2014, a Cooper Marine towboat took the CMT 123B and the BIG 420 into tow at the Logistic Services facility in Columbus and dropped them at the Yellow Creek fleet in Lula, Mississippi, on March 14, 2014.

18.    On March 21, 2014, a Tennessee Valley Towing towboat took the CMT 123B and the BIG 420 into tow at the Yellow Creek fleet and dropped them at the American Commercial Lines fleet in Cairo, Illinois, on March 24, 2014.

19.    On March 30, 2014, an American Commercial Lines towboat took the CMT 123B and the BIG 420 into tow at the American Commercial Lines fleet and dropped them at the Kinder Morgan Marine Services fleeting facility in Hickman, Arkansas, on March 31, 2014, where they were taken into tow by a Kinder Morgan Marine Services towboat and placed in a Kinder Morgan Marine Services fleet.

20.    On March 21, 2014, the Black Belt took BIG 9911 into tow at Columbus, Mississippi.  On March 23, 2014, the Black Belt dropped off the BIG 9911 at the Yellow Creek fleet.  On March 31, 2014, the Lloyd Dunning picked up the BIG 9911 at Yellow Creek.  On April 4, 2014, the Lloyd Dunning dropped off the BIG 9911 at the American Commercial Lines

facility at Cairo. On April 8, 2014, an American Commercial Lines boat named the MV Cairo picked up the BIG 9911 and took it to Hickman.

21. The distance that the CMT 123B, the BIG 420, and the BIG 9911 traveled from Columbus to Hickman was approximately 500 miles.

22. IPSCO contracted with Kinder Morgan for Kinder Morgan to unload the steel coils at Kinder Morgan's facility in Hickman, Arkansas.

23. On the morning of April 8, 2014, the BIG 420 was unloaded by Kinder Morgan Bulk Terminals personnel at the Kinder Morgan Bulk Terminals coil dock without incident.

24. On the afternoon of April 8, 2014, a Kinder Morgan Marine Services towboat, the Elmer Stone, took the CMT 123B from the Kinder Morgan Marine Services fleet to the Kinder Morgan Bulk Terminals coil dock for unloading by Kinder Morgan Bulk Terminals personnel. At some point after the sixth coil was removed from the hopper of the CMT 123B, the barge capsized and sank.

25. On April 9, 2014, Kinder Morgan rejected the BIG 9911. On April 10, 2014, the MV Cairo dropped off the BIG 9911 in Memphis for unloading. It was unloaded without incident.

26. Except for the CMT 123B, no report has been received of a steel coil coming off of one of the saddles provided by Steel Dynamics. Other than the BIG 9911, no barge loaded with steel coils by Logistic Services has ever been rejected.

27. The Logistic Services personnel relevant to this case include Eddie Rushing, Jason Colburn, Russell Caldwell, and Marty Rushing. Eddie Rushing became the operations manager at the Logistic Services facility in Columbus, Mississippi, in 2007 and continues in that position presently. He also operated a crane from 2007 until 2010, when Jason Colburn was hired as the crane operator. Russell Caldwell worked inside barges loading steel coils from 2007

until 2010. Eddie Rushing trained Caldwell on properly placing the saddles and loading the coils. Caldwell trained Marty Rushing, who took his place inside the barges, as to the same.

28. Caldwell would use a tape measure to measure from the hopper wall of the barge to determine the location of the center of the coil in relation to the floor of the barge so that he could situate the saddles correctly. He would use the tape measure for the first few saddles and then line up the subsequent saddles using those first saddles as a guide.

29. When Marty Rushing first began to load steel coils onto barges for Logistic Services, he would take measurements to mark the spot for the saddles. After some time he quit taking measurements and began to "eyeball" where to place the saddles.

30. The coils were loaded onto the barges using an overhead crane with a C-hook. As Colburn set a coil down, if it was not in the right place, Marty Rushing would give him a signal to stop. Marty Rushing then would slide the wooden saddle in or out to put it wherever it needed to be. Marty Rushing also would guide the C-hook that held the coil as it came down onto the wooden saddle. He was the only person down in the hopper of the barge as the coils were being loaded.

31. Marty Rushing estimated that he loaded 50 or 60 barges with steel coils. He did not testify as to how many of these barges were loaded with larger coils, such as those loaded on the CMT 123B. The smaller coils were placed across the barge 11 or 12 in rows or columns. The large coils were placed in two rows, one down each side of the barge, with part of each coil resting on the wall of the hopper and part of it resting on the saddle. Marty Rushing estimated that he would put the saddles 20 to 25 inches from the wall, but after a time he no longer took measurements, so this is simply an estimate.

32.    For the CMT 123B, Colburn and Marty Rushing loaded 23 coils down each side for a total of 46 coils loaded on that barge. They did not place a coil in the middle of the barge. Coils were placed along the hopper walls, with the eye of each coil facing the bow and the stern of the barge. There was nothing between the two rows of coils except open deck. The coils ranged in weight from approximately 60,000 pounds to approximately 68,000 pounds.

33.    For the BIG 420, Colburn and Marty Rushing loaded 22 coils down each side and put one in the middle for a total of 45 coils loaded on that barge. The coils ranged in weight from approximately 55,000 pounds to approximately 68,000 pounds.

34.    For the BIG 9911, Colburn and Marty Rushing loaded 24 coils down each side for a total of 48 coils loaded on that barge. The total tonnage was 1,587.20.

35.    The relevant Kinder Morgan Bulk Terminals personnel include Fred Siebert, Grady Hamilton, E.Z. Mesa, Juan Nieves, and Nicholas Perez-Hernandez. Siebert was the operations supervisor in April of 2014, and had held that position for approximately four months. Hamilton was the crane operator at the Hickman facility from 2011 through 2017. Nieves and Mesa were the two most experienced members of the coil crew. Perez-Hernandez was being trained by Nieves and Mesa in April of 2014.

36.    Hamilton estimated that he unloaded approximately 400 to 500 barges of steel coils during the time he was employed at the Kinder Morgan Bulk Terminals Hickman facility. Other than the CMT 123B, there was never an occasion when a coil rolled off its dunnage during the unloading process.

37.    The Kinder Morgan Bulk Terminals unloading dock had a fixed coil dock with a crane sitting on that dock that was normally used for unloading coil barges. That crane was out of service on April 8. As a result, Kinder Morgan brought in a crane barge with a different

crane to use as a temporary replacement for the crane that was on the fixed coil dock. The crane barge was secured to the coil dock, and the barge to be unloaded then was secured in a position adjacent to the crane barge, which meant that the barge being unloaded was farther out into the river than was typically the case.

38.     The BIG 420 was unloaded without incident on the morning of April 8, 2014. Mesa and Perez-Hernandez worked inside the hopper of the barge during the unloading process. Perez-Hernandez was assigned to check the numbers on the coils against the manifest. Mesa communicated with Hamilton with respect to movement of the C-hook during the unloading process. He also was responsible for inspecting the cargo to ensure that it was stowed securely and could be unloaded safely.

39.     On the afternoon of April 8, 2014, the Elmer Stone delivered the CMT 123B to the Kinder Morgan coil dock for unloading. The CMT 123B was placed parallel and adjacent to the crane barge, with the bow upriver and the stern downriver, the starboard side toward the river and the port side toward the dock.

40.     Kinder Morgan Bulk Terminals began unloading the CMT 123B that same afternoon. Nieves replaced Mesa as the person inside the barge hopper responsible for inspecting to ensure that the cargo was securely stowed and could be off-loaded safely and for directing Hamilton in the movement of the C-hook during the unloading process. Kinder Morgan had chocks available to use for additional dunnage if Nieves believed that some of the coils were not stowed securely. Nieves also had the option of deciding that the barge could not be unloaded safely, in which case Kinder Morgan would reject it. He did not use chocks as additional dunnage for the CMT 123B, nor did he report that the coils could not be unloaded safely.

8

41. The Kinder Morgan Bulk Terminals coil dock is situated on the west side of the Mississippi River a short distance downstream from a bend in the river. It appears from overhead photographs introduced into evidence that the river flows in a westerly direction above the bend and then turns south. The river was high on April 8, 2014. The current was stronger than normal. When the river is high, boats going upstream navigate closer to the coil dock so they can get their tow to hit the current in a manner that will keep the current from catching the tow and pushing the tug and the tow onto the bank.

42. Grady Hamilton testified that the CMT 123B had 23 coils on the dock side, 22 on the river side, and one in the middle. That testimony is inaccurate. Logistics Services loaded the CMT 123B with coils 23 down each side, and there is no reason to believe that a coil was moved during transit. It appears that Grady Hamilton's memory as to the manner in which the coils were loaded confused the CMT 123B with the BIG 420.

43. Grady Hamilton testified that it was his practice when unloading coils with an even number on each side, to begin with the coil on the starboard or river side nearest the stern, then take the coil on the port side or dock side nearest the stern, and alternate back and forth from side to side working from the stern end to the bow end. The preponderance of the evidence indicates that that is the manner in which he proceeded in offloading the steel coils from the CMT 123B.[3]

---

[3] At his deposition, Hamilton was shown a stowage plan for the CMT 123B and asked to explain how he unloaded it. He testified that he first unloaded the trim coil in the middle, then took the first coil on the starboard or river side and alternated back and forth, taking a total of six coils before the barge capsized. If that testimony were accurate, it would mean that Hamilton created a two coil imbalance by starting on the river side. It seems that Hamilton was confused by the appearance of the stowage plan, which is a pre-printed chart with 23 rows down each side. *See* LSI-Ex. 35. At trial, Hamilton was shown a model with 22 coils on the river side, 23 on the dock side, and one in the middle. LSI-Ex. 38. Looking at that model, Hamilton testified that he first took the

44. When Hamilton would lift a coil from the barge with the C-hook, he would pivot the crane and place the coil on a truck, after which he would pivot the crane back into place to reach into the hopper of the barge to retrieve another coil. As he was placing the sixth steel coil from the CMT 123B onto a truck, he heard a noise that sounded like a barge bumping. When he pivoted back around, he looked for Nieves. Nieves appeared, looked up at Hamilton, and laughed. Nieves then walked over to the seventh coil, which was on the starboard or river side, to begin unloading it. Before Hamilton could begin to unload it, that coil came off of its saddle and rolled from the starboard or river side to the port or dock side. When that happened, according to Hamilton, the barge "raised up." Nieves ran for his life jacket. Another coil came loose in front of him, and he froze. When that second coil rolled across the barge, all of the coils started coming out of their saddles and rolling across the barge to the inside. The CMT 123B capsized and sank.[4]

45. A Kinder Morgan Marine Services tug, the Austin Stone, was pushing a barge loaded with scrap metal upriver at the time of the accident. The barge was approximately 30 to 40 feet wide and 150 to 200 feet long, with an underwater depth of approximately 12 feet.

---

trim coil in the middle and then the first coil on the dock side before taking the first coil on the river side. The discrepancy in the testimony appears to be related to the differences in visual appearances of the chart that was shown him in his deposition and the model shown him at trial. Regardless, the CMT 123B was loaded with 23 coils on each side, not with 23 on one side, 22 on the other side, and one in the middle.

[4] Perez-Hernandez was inside the hopper of the barge with Nieves when it sank. As with the BIG 420, his job was to check the numbers on each of the coils against the manifest. Both Nieves and Perez-Hernandez died as a result of the sinking of the barge. The personal representatives of their estates brought wrongful death actions, and those actions have been settled. The claims now before the Court were cross-claims asserted in the Nieves action.

46. Fred Siebert drove to a levy near the coil dock at approximately 3:15 p.m., which was shortly before the accident, to time the unloading of the coils to see whether overtime would be necessary to finish unloading the CMT 123B. According to his testimony at trial, while Hamilton was moving one of the coils, Siebert heard two clanks, which at the time he thought sounded like two barges hitting together, though at trial he testified that he no longer believed that the clank was two barges hitting together. Siebert kept on doing his figures until he heard Hamilton holler "barge sinking." Siebert turned around and saw the bow end, which was upstream, and the starboard or river side, elevated. He also saw the Austin Stone. He initially thought that the Austin Stone may have caused the accident, but after some thought he concluded that the Austin Stone did not contribute to the accident. He testified that the tugboat, itself, was probably three-quarters of the way up past the CMT 123B when the accident occurred. Shortly after the incident, Siebert wrote a statement describing his observations. In that statement he said, in pertinent part:

> I watched while Grady Hamilton lowered a coil onto the truck and start to swing back to the barge. At the same time I seen one of our tugs come by pushing a shred barge up to the scrap dock. I heard the coil barge and the 888 [crane] dock "clank" together and seen the upriver end of the barge raise up. I looked down to check to see how long the time had been, when I heard Grady come over the radio and say "I need everyone down here now, we have a barge sinking." [LSI Ex. 40; Kinder Morgan Ex. 4.]

47. Daniel Allen was a mate on the Austin Stone on April 8, 2014. He was in the wheel house as the Austin Stone passed by the CMT 123B. He first noticed that there was a problem with the CMT 123B when he saw that it was rocking aggressively. He said that it was strange for a barge to be rocking as aggressively as the CMT 123B was doing. Then, suddenly, the CMT 123B listed toward the crane and went under.

48. Shane Deaton was a mate on the Elmer Stone on April 8, 2014. After the CMT 123B was secured next to the crane barge, the Elmer Stone moved downriver to the Kinder Morgan Bulk Terminals cleaning dock, which was in view of the coil dock. According to Deaton, the Austin Stone—the tug—was already beyond the CMT 123B barge when it capsized.

49. Daniel Chewning is a marine surveyor who was called to the Kinder Morgan Bulk Terminals facility at Hickman after the CMT 123B had sunk. He arrived on April 9, 2014. The BIG 9911 arrived later that day. He inspected the BIG 9911 and took photographs. He found that the wooden saddles were not all an equal distance from the side of the barge. Some of them were closer to the side of the barge than others. Some of the saddles had the "riser"—his name for the three-inch end of the wooden saddle—crushed on the end farthest from the hopper wall.

50. Steel Dynamics' only involvement in stowing the steel coils was providing the hardwood saddles. Based on the fact that thousands of steel coils have been transported safely while sitting in the concave portion of the hardwood saddles, the saddles were adequate to carry the steel coils. There is no evidence that any of the saddles provided for the CMT 123B were defective.

51. Logistic Services is partially at fault for the sinking of the CMT 123B. Logistic Services argues that it loaded hundreds of barges with steel coils between 2007 and 2016, none of the steel coils came off of the saddles, none of the barges were rejected, and the loading process for the steel coils on the CMT 123B was the same as with all the other barges loaded with large steel coils. Therefore, Logistic Services argues, it was not negligent. Logistic Services' Exhibit 3 shows that 77 barges were loaded with the large steel coils between March 4, 2008, and September 27, 2014. The document does not distinguish between the

number of large steel coils sent to Vicksburg for loading and the number loaded in Columbus. Assuming that the majority of the barges loaded with large steel coils were loaded by Logistic Services in Columbus, Logistic Services loaded 40 or more barges with large steel coils during this six-and-a-half year period without incident. Those barges were not, however, all loaded in the same manner. Caldwell used a tape measure to determine the proper distance from the hopper wall for placing the saddles. Marty Rushing followed the same procedure for a period of time. After some unspecified time had passed, however, he decided that he could situate the wooden saddles without measurements and began to "eyeball" where to place them. The Chewning inspection of the BIG 9911 established that Marty Rushing did not place all of the saddles an equal distance from the hopper walls: some were closer to the hopper walls than others. At least some of the saddles placed closer to the hopper walls had the steel coils sitting on the "risers," i.e., the three-inch end of the saddles, rather than in the concave portion where the coils were supposed to sit. Those "risers" were crushed so that they were no longer three inches high. The manner in which these steel coils were placed on the "risers," rather than in the concave portions of the saddles where they were supposed to sit, made them more susceptible to rolling off of the saddles than if they had been placed properly in the concave portion of the saddles. Because the CMT 123B was loaded by the same persons at nearly the same time as the BIG 9911, it likely was loaded in the same manner, with some saddles placed closer to the hopper walls than others and some of the "risers" crushed.

52. Placing the large steel coils in two lines along the hopper walls is a reasonable stowage plan for 68,000 pound steel coils so long as the steel coils are placed securely in the concave portion of the saddles. The danger in that stowage plan is that if a coil rolls off of the saddle

13

it will roll across the barge, some 35 feet wide, and hit the other side, which is likely to cause other steel coils to roll off of the saddles and the barge to capsize—which is what happened here.

53. Although the Logistic Services' manner of lining the coils down the sides of the hopper walls is safe so long as the coils are placed securely in the saddles, it is not safe when some of the coils are placed on the "risers" and crush them.

54. Steel coils weighing 68,000 pounds can be safely stowed on a barge in a manner that would prevent a coil that comes off its saddle from rolling the entire width of the barge. For example, when Kinder Morgan loaded steel coils for Steel Dynamics in Vicksburg, Mississippi, the larger coils were turned so that the eye of the coil was facing to the starboard or port side, and they were staggered throughout the barge so that the C-hook could get to whichever coil the crane operator chose to unload in order to keep the barge level. This staggering of the large coils throughout the barge meant that if a coil came off of its saddle, it could not roll far and likely would not cause the barge to capsize. In addition, Hamilton testified that most of the barges that he unloaded with large coils had coils placed across the barge in such a way that if one came loose it did not have far to roll.

55. Kinder Morgan Bulk Terminals is partially at fault for the sinking of the CMT 123B. As stated in the preceding paragraphs, some of the steel coils on the CMT 123B were not securely stowed. Reasonable care required a stevedore to inspect to see whether the coils were stowed securely. For coils that were not stowed securely, chocks could be used, along with the saddles, to secure them. Kinder Morgan Bulk Terminals also could reject a barge with cargo that was not securely stowed.

56.     Kinder Morgan Marine Services is partially at fault for the sinking of the CMT 123B. As noted above, because the crane on the fixed coil dock was not in service, a crane barge was secured to the fixed coil dock, and the CMT 123B was secured adjacent to the crane barge. The result was that the CMT 123B was approximately 140 to 160 feet out into the river, which was farther out into the river than was customary for a barge being unloaded at the Hickman terminal. Because the river was high and because of the speed and direction of the current coming around the bend north of the coil dock, the Austin Stone pushed closer to the coil dock than it would do when the river was not so high. The fact that the CMT 123B was farther out into the river than usual, coupled with the fact that the Austin Stone was traveling closer to the coil dock than usual, means that the Austin Stone was traveling significantly closer to the CMT 123B than would typically be the case when a tug pushing a barge passes a barge that is being unloaded at the Hickman coil dock. Although Kinder Morgan Marine Services has argued that the Austin Stone would not have produced much of a wake, or if it did the wake had not reached the CMT 123B when the accident occurred, the preponderance of the evidence is to the contrary. First, as a matter of basic physics and common sense, a barge that is 30 to 40 feet wide and 150 to 200 feet long with an underwater depth of 12 feet will displace a large volume of water. The displaced water must go somewhere, and it will unsettle whatever is in its path for some distance. Second, the testimony of Shane Deaton places the Austin Stone past the CMT 123B at the time the accident occurred, which means that the wake of the Austin Stone, as well as the barge it was pushing, could have reached the CMT 123B. Furthermore, Daniel Allen testified that the CMT 123B began rocking aggressively before it capsized. The most likely explanation for this rocking is that the wake from the passing barge, tug, or both reached the CMT 123B.

Third, Siebert's handwritten statement says that when he heard a clank that sounded like two barges banging together, he saw the river side, upriver end of the CMT 123B raise up. Coils were being removed from the downriver end, which means that the downriver end should have been rising, not the upriver end. Some force had to act on the upriver end to cause it to raise up. That end was toward the Austin Stone. The most likely explanation for that end raising is that it was struck by the wake from the Austin Stone. Fourth, both Grady Hamilton and Fred Siebert heard a noise that they initially thought was the clank of two barges hitting together. They later concluded that it must have been the sound of a steel coil rolling across the barge and hitting a steel coil on the other side. The flaw in their later conclusions is that after they heard the clank, Nieves appeared, smiled at Hamilton, and moved toward the seventh coil to remove it. If one of the coils had already come out of its saddle and rolled across the barge, it is unlikely that Nieves would have reacted in such a matter-of-fact, business-as-usual manner. His behavior is consistent with the proposition that the CMT 123B and the crane barge clanked together, but it is not consistent with the proposition that one of the steel coils had rolled off its saddle and across to the other side of the barge. Hamilton and Siebert's initial impression is probably correct: the sound they heard was the clanking of two barges together. The most likely explanation is that the force from the wake of the passing barge, tug, or both hit the CMT 123B and pushed it against the crane barge.

57. In summary, it is more likely than not that the negligence of Logistic Services, Kinder Morgan Bulk Terminals, and Kinder Morgan Marine Services contributed to the accident that caused the CMT 123B to sink. Logistic Services loaded the steel coils in such a manner that some of them did not sit in the concave portion of the saddle. Instead, some of the coils sat on the "risers" and crushed them so that the coils were more likely to roll off the saddle

than would have been the case if they had been properly placed in the concave portion of the saddle. Kinder Morgan Bulk Terminals was negligent in failing to conduct a proper inspection before beginning the unloading process and in failing either to place chocks under the insecurely stowed coils or to reject the barge. Kinder Morgan Marine Services was negligent inasmuch as the Austin Stone passed too close to the CMT 123B as it was being unloaded, and the wake from the barge, the tug, or both caused the CMT 123B to bang against the crane barge and to rock aggressively, which then caused the coils that were not properly secured to roll off the saddles. The negligence of these three defendants contributed to the sinking of the CMT 123B.

58. CMT 123B was salvaged from the bottom of the river and towed to a Cooper Marine facility in Darrow, Louisiana. Cooper Marine was obligated to participate in the salvage and to pay a portion of the salvage costs. The CMT123B was later towed from the Louisiana facility to Cooper Marine's facility in Mobile, Alabama. The CMT 123B was deemed to be a constructive total loss.

59. On April 8, 2014, Cooper Marine was the owner pro hac vice of the CMT 123B under a bare-boat charter dated January 1, 2011, between Cooper Marine and GATX Third Aircraft Corporation, which was the owner. That bare-boat charter provided for a stipulated loss value after 39 months of $323,239.44, which is less than the fair market value of the CMT 123B immediately before it sank. That amount was paid to GATX on behalf of Cooper Marine by Cooper Marine's insurer. Upon payment of that amount, the insurer became the owner of the CMT 123B. No evidence established the date of this payment.

60. Cooper Marine's representative, Bobby Pittman, testified that the CMT 123B had a scrap value of $69,000. Hence, when the insurer paid the stipulated loss value to GATX and

became the owner of the CMT 123B, it acquired an asset worth $69,000. The actual loss, therefore, was $323,239.44 less $69,000, which equals $254,239.44. Cooper Marine purchased the CMT 123B from the insurer for that amount—$69,000. Cooper Marine initially acknowledged that the $69,000 must be deducted from the loss in a demonstrative exhibit, Cooper Marine Ex. 14, and in a pretrial brief submitted in chambers. During and after the trial, however, it has argued that that amount should not be deducted. Cooper Marine complains that it has not been able to use the CMT 123B because of an order from the Coast Guard, which has not completed its investigation into the incident; but the testimony of its own witness established that the $69,000 was scrap value, not the value of a usable barge. Just as the insurer paid $69,000 and acquired an asset worth $69,000, so did Cooper Marine. Cooper Marine did not experience a loss of the $69,000.

61. The bare-boat charter required Cooper Marine to pay a per diem to GATX from April 8 to May 30, 2014, in the total amount of $6,625. The insurer paid that amount on behalf of Cooper Marine. No evidence established the date of payment.

62. Cooper Marine paid Big River Shipbuilding a total of $133,500 to salvage the CMT 123B. Cooper Marine's Exhibit 11 is an invoice for this charge. No evidence established the date of payment.

63. Cooper Marine paid Kyle Smith Marine Surveying $16,121.75 in connection with the salvage of the CMT 123B. The record does not reflect a date of payment. Cooper Marine's post-trial brief reports February 19, 2018, as the date and cites its Exhibit 13. That exhibit is the Kyle Smith Marine Services invoice, which is stamped as received by the Cooper T-Smith claims department on February 19, 2018. It does not show a date of payment.

64. Under the terms of the bare-boat charter, Cooper Marine was required to reimburse GATX for the cost of marine surveyors. GATX incurred $5,325 for Michel Marine Surveyors in connection with the salvage of the CMT 123B as shown on Cooper Marine's Exhibit 14, which is the invoice for the charge. Cooper Marine paid that amount. No evidence established the date of payment.

65. Cooper Marine's insurers paid Rivers & Gulf Marine Surveyors $16,322.51 to represent its interests in the salvaging of the CMT 123B. That amount was not paid by or on behalf of Cooper Marine. It was, instead, paid by the underwriters to protect the underwriters' interests. Cooper Marine cannot recover that amount, which it did not pay and which was not paid on its behalf.

66. Cooper Marine paid Yazoo River Towing for towage from Memphis, Tennessee, to its facility in Darrow, Louisiana, in the total amount of $5,711.40. Cooper Marine's Exhibit 16 is the invoice for this charge. No evidence established the date of payment.

67. Cooper Marine paid an affiliate, Cooper Consolidated Marine, $11,564.90 for fleeting in Darrow, Louisiana. Cooper Marine's Exhibit 17 reflects this charge. No evidence established the date of payment.

68. Cooper Marine eventually towed the CMT 123B from Darrow, Louisiana, to its facility in Mobile, Alabama. Cooper Marine would have charged a customer $8,000 for that towing. That amount does not reflect any expense that Cooper Marine paid or that was paid on behalf of Cooper Marine.

69. In making these findings of fact, the Court has not relied upon any of the expert witnesses. James Manley was not a credible witness. Ronald Campana and Marc Fazioli were credible,

but they did not offer opinions as to the cause of the CMT 123B sinking, and the opinions they did offer were not particularly helpful to the Court as a trier of fact.

## II.  APPLICABLE PRINCIPLES OF LAW

Federal maritime law determines the scope of the duty of care in admiralty cases.  *Pope & Talbot v. Hawn*, 346 U.S. 406, 409-10, 74 S. Ct. 202, 205, 98 L. Ed. 143 (1953).  The duty of care may be derived from: (1) duly enacted laws, regulations, and rules; (2) custom; and (3) the dictates of reasonableness and prudence.  1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5-2 (5th ed. 2011).  Admiralty courts rely on general principles of negligence in analyzing maritime tort cases.  *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980).  Admiralty has accepted the doctrine of *Palsgraf v. Long Island R. Co.*, 162 N.E. 99 (1928).  A duty of care exists when an injury is reasonably foreseeable, which is determined by "examin[ing] and weigh[ing] the probability of an accident, the potential extent of the injury, and the cost of adequate precautions." Schoenbaum, at § 5-2.

As Logistic Services points out, a loading stevedore must load the cargo so that an expert and experienced stevedore will be able to discharge the cargo with reasonable safety by exercising reasonable care.  *Couch v. Cro-Marine Transp., Inc.*, 44 F.3d 319, 327 (5th Cir. 1995).  The issue here, however, is not what duty the loading stevedore owes to the unloading stevedore; rather, the issue here is what duty the loading stevedore owes to the vessel owner.  Stevedores owe to vessel owners "the duty of using due care in the loading."  *Cornec v. Baltimore & O.R. Co.*, 48 F.2d 497, 502 (4th Cir. 1931).  Similarly, an unloading stevedore owes the vessel owner a duty of using reasonable care in the unloading. *Maurice Pincoffs Co. v. Dravo Mechling Corp.*, 697 F. Supp. 244, 249 (E.D. La. 1987) (failure of a stevedore to exercise reasonable care in unloading is negligence);

*cf. Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 302-03, 79 S. Ct. 766, 769-70, 3 L. Ed. 2d 820 (1959).

Logistic Services' post-trial brief argues that Kinder Morgan's negligence was a superseding cause which exonerates Logistic Services from liability. The doctrine's two elements, as explained in Schoenbaum, leave Logistic Services' argument falling short. "[A]n intervening act can constitute a superseding cause, relieving the original actor from liability" if:

> (1) the intervening force must bring about a harm that is different in kind from that which would otherwise have resulted from the actor's negligence.
>
> (2) the intervening force must not be a normal result of the original actor's negligence.

Schoenbaum at § 5-3. Here, the harm that resulted—sinking—is not different in kind from that which would have resulted from Logistic Services' negligence. *Cf. Lone Star Indus., Inc. v. Mays Towing Co., Inc..*, 927 F.2d 1453, 1459 (8th Cir. 1991). Furthermore:

> [A]n actor whose negligence has set a dangerous force in motion is not saved from liability for harm it has caused to innocent persons solely because another has negligently failed to take action that would have avoided this. As against third persons, one negligent actor cannot defend on the basis that the other had "the last clear chance." The contrary argument grows out of the discredited notion that only the last wrongful act can be a cause—a notion as faulty in logic as it is wanting in fairness.

*Petition of Kinsman Transit Co.*, 338 F.2d 708, 719 (2d Cir. 1964) (citations omitted).

Logistic Services also argues that Kinder Morgan was a bailee and should be presumed at fault because the loss of the barge occurred while it was in Kinder Morgan's custody. A Seventh Circuit case explains well why this is not correct:

> The issue of bailment is a red herring in this case—and for another reason as well. TDI's duty to National Marine to shoulder, if itself negligent, some part of the liability to the plaintiffs does not arise from any bailment, but from the admiralty rule that joint tortfeasors are entitled to an apportionment of liability in accordance with their relative fault. If TDI's negligence was responsible in part for the damage to the

plaintiffs' property, then TDI was a tortfeasor, whether or not it was a bailee, and National Marine would be entitled to some contribution from TDI to help defray their joint liability to the plaintiffs.

*Rodi Yachts, Inc. v. Nat'l Marine, Inc.*, 984 F.2d 880, 886 (7th Cir. 1993).

Admiralty law imposes a duty on vessels to exercise reasonable care when passing other vessels, especially docked or moored vessels. *See Maxwell v. Hapag-Lloyd Aktiengesellschaft, Hamburg*, 862 F.2d 767, 769 (9th Cir. 1988); *Anthony v. Int'l Paper Co.*, 289 F.2d 574, 579 (4th Cir. 1961). As one court long ago observed, "[t]he number of cases arising from injuries caused by the swell of steamers is very great, and the reported decisions are many in number." *The Chester W. Chapin*, 155 F. 854, 856 (E.D.N.Y. 1907). That court deduced the following principle: "That the boat causing the injury must be held responsible for any failure to appreciate the reasonable effect of its own speed and motion through the water at the particular place and under the particular circumstances where the accident occurred." *Id*. at 859.

Comparative or proportionate fault now determines the liability of joint tortfeasors in federal maritime matters. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S. Ct. 1708, 1715-16, 44 L. Ed. 2d 251 (1975) (rejecting the rule of divided damages and allocating liability based on comparative fault); *see also McDermott, Inc. v. AmClyde*, 511 U.S. 202, 217, 114 S. Ct. 1461, 1470, 128 L. Ed. 2d 148 (1994) (holding "that the proportionate share approach is superior, especially in its consistency with *Reliable Transfer*"); *Lexington Ins. Co. v. S.H.R.M. Catering Servs., Inc.*, 567 F.3d 182, 185 (5th Cir. 2009) (explaining that *McDermott*'s framework makes a joint tortfeasor "ultimately liable only for his proportionate share of fault"). Maritime law is also governed by the common law rule of joint and several liability. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 271 n.30, 99 S. Ct. 2753, 2762, 61 L. Ed. 2d 521 (1979). This rule allows a plaintiff

to recover all of his damages from a single defendant tortfeasor, even though another tortfeasor may have also been at fault. *Id.* at 260 n.8, 99 S. Ct. at 2756.

A vessel owner may recover necessary expenses resulting from a collision, such as mandatory wreck removal. *Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 253 (5th Cir. 1988); *Tucker Energy Servs., Ltd. v. Hydraquip Corp.*, Civil Action No. H-05-1265, 2007 WL 2409571 (S.D. Tex. Aug. 20, 2007). Under maritime law, the awarding of prejudgment interest is the rule rather than the exception. *Albany Ins. Co.*, 857 F.2d at 253-54. The district court may deny prejudgment interest only where peculiar circumstances make such an award inequitable. *Id.* at 254. Cooper Marine argues that prejudgment interest on the loss of the vessel should begin on the date of the incident, while prejudgment interest for other recoverable expenses should begin on the date those expenses were paid by or on behalf of the vessel owner or charterer. Because Cooper Marine was not the owner of the vessel, however, prejudgment interest should begin to run on the date that the stipulated loss amount was paid to the owner.

### III. FINAL CONCLUSIONS

Based on the findings of fact and the principles of law articulated above, the Court makes the following final conclusions regarding liability and damages:

1.      Steel Dynamics, LLC, is not at fault in the sinking of the CMT 123B.

2.      The motion for judgment as a matter of law by Logistic Services, Inc., is DENIED. Document #459.

3.      The motion for judgment on partial findings by Kinder Morgan Bulk Terminals, Inc., and Kinder Morgan Marine Services, LLC, is GRANTED IN PART and DENIED IN PART. Document #461. The motion is granted as to the cross-claim of Logistic Services for contribution

but denied insofar as it seeks dismissal of the property damage claim by Cooper Marine & Timberlands Corporation.

4.    Logistic Services, Inc., failed to exercise reasonable care in loading and stowing the steel coils on the CMT 123B.  The negligence of Logistic Services, Inc., was a proximate cause of the sinking of the CMT 123B.  The percentage of fault attributable to Logistic Services, Inc., for the damages incurred by Cooper Marine & Timberlands Corporation as a result of the sinking of the CMT 123B is 40%.

5.    Kinder Morgan Bulk Terminals, Inc., failed to exercise reasonable care in unloading the steel coils from the CMT 123B.  The negligence of Kinder Morgan Bulk Terminals, Inc., was a proximate cause of the sinking of the CMT 123B.  The percentage of fault attributable to Kinder Morgan Bulk Terminals, Inc., for the damages incurred by Cooper Marine & Timberlands Corporation as a result of the sinking of the CMT 123B is 40%.

6.    Kinder Morgan Marine Services, LLC, failed to appreciate the reasonable effect of its own speed and motion at the particular place and under the particular circumstances where the accident occurred.  The negligence of Kinder Morgan Marine Services, LLC, was a proximate cause of the sinking of the CMT 123B.  The percentage of fault attributable to Kinder Morgan Marine Services, LLC, for the damages incurred by Cooper Marine & Timberlands Corporation as a result of the sinking of the CMT 123B is 20%.

7.    Logistic Services, Inc., Kinder Morgan Bulk Terminals, Inc., and Kinder Morgan Marine Services, LLC, are jointly and severally liable for the damages incurred by Cooper Marine & Timberlands Corporation as a result of the sinking of the CMT 123B.

8.    Cooper Marine & Timberlands Corporation was not the owner of the CMT 123B on the date that it sank, so the measure of damage is not the fair market value of the barge.  Cooper

Marine & Timberlands Corporation's loss was the stipulated value that was paid to the owner on behalf of Cooper Marine & Timberlands Corporation pursuant to the bare-boat charter less the scrap value of the barge that was obtained in return for payment of the stipulated loss value. That amount is $254,239.44. Cooper Marine & Timberlands Corporation is entitled to recover damages in the amount of $254,239.44 for the constructive total loss of the CMT 123B. Because no evidence established the date of payment, prejudgment interest cannot be awarded.

9.    Cooper Marine & Timberlands Corporation is entitled to recover the per diem paid to GATX in the amount of $6,625.00. Because no evidence established the date of payment, prejudgment interest cannot be awarded.

10.    Cooper Marine & Timberlands Corporation is entitled to recover the amount of $133,500.00 for the amount paid to Big River Shipbuilding to salvage the CMT 123B. Because no evidence established the date of payment, prejudgment interest cannot be awarded.

11.    Cooper Marine & Timberlands Corporation is entitled to recover the amount of $16,121.75 paid to Kyle Smith Marine Surveying in connection with the salvage of the CMT 123B. Because no evidence established the date of payment, prejudgment interest cannot be awarded.

12.    Cooper Marine & Timberlands Corporation is entitled to recover the amount of $5,325.00 paid for Michel Marine Surveyors on behalf of GATX. Because no evidence established the date of payment, prejudgment interest cannot be awarded.

13.    Cooper Marine & Timberlands Corporation is entitled to recover the amount of $5,711.40 paid to Yazoo River Towing for towage from Memphis, Tennessee, to Darrow, Louisiana. Because no evidence established the date of payment, prejudgment interest cannot be awarded.

14.     Cooper Marine & Timberlands Corporation is entitled to recover the amount of $11,564.90 paid to Cooper Consolidated Marine for fleeting in Darrow, Louisiana.  Because no evidence established the date of payment, prejudgment interest cannot be awarded.

15.     Cooper Marine & Timberlands Corporation is not entitled to recover the amount of $16,322.51 paid to Rivers & Gulf Marine Surveyors by Cooper Marine's insurers to represent the interests of those insurers.

16.     Cooper Marine & Timberlands Corporation is not entitled to recover the amount of $8,000.00 that it would have charged a customer to tow the CMT 123B from Darrow, Louisiana, to Mobile, Alabama.

17.     Judgment will be entered in favor of Cooper Marine & Timberlands Corporation against Logistic Services, Inc., Kinder Morgan Bulk Terminals, Inc., and Kinder Morgan Marine Services, LLC, in the amount of $433,087.49, plus post-judgment interest pursuant to 28 U.S.C. § 1961.

IT IS SO ORDERED this 18th day of April, 2018.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE